Madden, Judge,
delivered the opinion of the court:
The plaintiff brings this suit under Sections 13 and 17 of the Contract Settlement Act of 1944, which Act is 58 Stat. 649, 41 U. S. Code 101-125. The suit is, in effect, an appeal to this court pursuant to Section 13 (d) (2) of that Act, from the decision of the Appeal Board provided for in Section 13 (d) (1) of the Act. The Appeal Board had affirmed the decision of the Maritime Commission which was adverse to the plaintiff in regard to the items here in suit.
The plaintiff and a Canadian affiliate had been since 1940 in the business of installing plastic armor made of asphalt and gravel or similar material, for the protection of the bridges, gun nests, and other exposed parts of ships. Its method of installation was to bring its equipment to the side of the ship and apply the plastic material directly to the ship. The Government, after some experimentation, decided in February of 1944 to have the plastic material placed in metal pans which, in turn, would be carried to the ship and welded in place. The pans and their contents required for a given ship were known as a shipset. The number and size of the pans needed to make up a shipset varied with the size and type of the ship. The whole operation was known as installing Plastic Protective Plating or PPP.
When the new method was decided upon, the Maritime Commission obtained from the Navy Department a list of nine contractors who in the opinion of the Navy were qualified to perform the new operation. The Commission inquired of the nine and found that five of them were interested. Of the five, one, the Flintkote Company, had done experimental work of the new type. The others had not. In February 1944, the Commission issued inquiries and specifications to the five interested contractors soliciting bids on a total of 943 shipsets. Bids were submitted, and the plaintiff’s was the lowest. The Commission became aware that the plaintiff had no factory or equipment in Baltimore for doing the work, though the plaintiff represented that it *622 bad adequate equipment elsewhere which could be moved wherever it was needed. The plaintiff said that it could not build a plant and participate in the program unless it had an order. The Commission gave the plaintiff an order for 20 shipsets. The plaintiff built a plant in Baltimore which cost some $15,000, and installed equipment costing some $14,000. It manufactured the 20 shipsets but was far behind the contract time in its delivery of them. Some, at least, of the other interested contractors were given small orders so that they could try their hand at the process.
In negotiating its contract for the 20 shipsets the plaintiff increased substantially the price which it had bid for the larger number. On this occasion, and in soliciting further orders from the Commission, it said that if it could get contracts for at least 250 shipsets it would distribute the amortization of its plant over that number and save the Government money.
No further contracts were awarded to the plaintiff in 1944. In 1945 contracts for a total of 93 shipsets were awarded to the plaintiff on various dates from April 2 to July 21. Sixty-eight of these shipsets were delivered and the contract price was paid for them. These, with the 20 delivered 1944, made a total of 88 which the plaintiff completed. As shown in Findings 22 and 24, the last three orders issued to the plaintiff were terminated by the Commission before they were completed, the fighting war having ended. The dates of termination were August 21 and August 23, 1945. The total contract price of the terminated work was $68,996.68.
The present controversy has two phases. The first is the plaintiff’s claim that it is entitled, under the Contract Settlement Act of 1944, to be paid $24,899.16, which is the part not already amortized of the cost of its building and equipment. The second is the plaintiff’s claim that it was not allowed an adequate amount by the Maritime Commission and the Contract Settlement Appeals Board for its post-termination settlement expenses.
As to the first element of the plaintiff’s claim, we hold that it is not entitled to recover. The plaintiff relies upon Section 17 of the Contract Settlement Act of 1944, which *623 section we quote in a footnote.[1] The plaintiff contends that there was an oral promise made by the agent of the Maritime Commission to award the plaintiff contracts for 250 shipsets. If such an informal promise had been made, the plaintiff would have had rights under Paragraph (a) of Section 17. The evidence persuades us that there was no such informal promise. But plaintiff says that, whether or not there was such an informal contract, there was a situation such as is covered by Section 17 (b) (3) of the Act, of an obligation “whether expressed or implied, in fact or in law, or in the nature of an implied or quasi contract.”
The words just quoted are very broad, and were, no doubt, intended to be liberally interpreted. The plaintiff says that, considering the whole situation, the Government was unjustly enriched by the plaintiff’s expenditure for plant - and equipment, and therefore became quasi-contractually obligated to reimburse it. We do not think so. The plaintiff wras not urged by the Government to construct and equip its plant. It was anxious to get a share of the prospective business, and persistently urged that it be given orders. It made a low bid on a large contract and when it was not given a contract because it had no plant, it requested at least a small contract, so that it could get into production and show what it could do. It was given a small contract and had, at that time, *624 difficulty and delay in performing it. It continued to seek more orders and in the following year received orders for 98 more shipsets. We find no basis in this history for a claim that the Government has been unjustly enriched at the plaintiff’s expense. If there is unjust enrichment here, there is in every case where a contractor, hopeful of getting Government contracts and taking his chances that the Government will continue to need his products and that the contracts will not be taken by his competitors, spends money to equip himself to perform the contracts if he gets them. This kind of situation1 creates no quasi-contractual situation in the law generally nor under the Contract Settlement Act.
Section 6 (;d) of the Contract Settlement Act of 1944, 41 TJ. S. C. 106 (d), gives some directions for the determination of fair compensation to the contractor under a terminated contract. Other sections of the Act, Sections 4 (b), 6,12, and 20 (d) of the Act, authorize the Director of the Office of Contract Settlenlent to issue Regulations. Regulation No. 5, dated September 30,1944, 9 Fed. Reg. 12282, defined “fair compensation.” One of its paragaphs was as follows:
(f) Loss on facilities — conditions on allowance. In the case of any special facility acquired by the contractor solely for the performance of the contract, or the contract and other war-production contracts, if upon termination of the contract such facility is not reasonably capable of use in the other business of the contractor having regard to'thp then condition and location of such facility, an amount \which bears the same proportion to the loss of useful value as the deliveries not made under the contract bear to the total of the deliveries which have been made and would have been made had the contract and the other contracts been completed, * * * provided that no amount shall be allowed under this paragraph unless upon termination of the contract title to the facility is transferro,d to the Government, except where the Government elects to take other appropriate means to protect its interests.
The plaintiff contends that if it is not given compensation for the unamortized portion of the cost of its plant and facilities on the basis of its alleged informal contract for 250 shipsets, it should at least have the benefit of Section (f) just quoted. We agree with 'this contention of the *625 plaintiff. The plaintiff’s building, and its equipment in the form to which it was converted, were acquired solely for the performance of the terminated contracts and the other war-production contracts which were completed. After termination the building and equipment were not reasonably capable of use in the other business of the plaintiff. As shown in Findings 22 and 24, the dollar value of the two wholly terminated contracts and the terminated portion of the third contract was 24 percent of the dollar value of all of the plaintiff’s war-production contracts for which the facilities in question were used or would have been used, but for the termination. We therefore allow the plaintiff $7,270.90 on this account. This is 24 percent of $30,295.45, which is the residual value of the plaintiff’s building and equipment, after deducting the net sum for which the plaintiff sold the building.
Another controverted item in the case is the General and Administrative expense properly allocable to the items of materials listed in our Finding 28, and a labor item of $86. The Maritime Commission computed the General and Administrative expenses at 24.36 percent of the direct costs. We have found in this connection, as we have in connection with the cost of the building and equipment, in Finding 30, that the proper percentage allowable for overhead was 18.465 percent. This percent of $11,822.02, the direct costs here in question, is $2,182.94, which we allow.
We now consider the plaintiff’s claim for larger allowance for post-termination expenses. Our Finding 36 shows the items of post-termination settlement expenses which we have allowed. The Government would reduce or eliminate many of these items. It contends, in effect, that the plant, equipment and materials could have been left unguarded for the several months after termination before the Government’s agent arrived to make an inventory and give directions for the disposition of the property. We think that the plaintiff’s expenditures, as shown in Finding 36, in caring for and attempting to dispose of the property were reasonable and should be reimbursed to it.
The percentage of profit which we have allowed was pre *626 scribed by Art. 13 (d) (2) of each of the contracts, which provision is quoted in our Finding 23.
Section 6 (f) of the Contract Settlement Act, 41U. S. C. 106 (f), provides for interest at 2% percent, beginning 30 days after the termination. Our judgment includes such interest, after deducting partial payments, to the day of judgment.
. The plaintiff is entitled to recover $20,394.76, together with interest at the rate of 2y2 percent on $18,313.82 from this date tó' the date of payment. It is so ordered.
Howell, ; Judge; Wliitakee, Judge; LittletoN, Judge; and JONES, OMef Judge, concur.

 Sec. 17. (a) Where any person has arranged to furnish or furnished to a contracting agency or to a -war contractor any materials, services, or facilities related to the prosecution of the war, without a formal contract, relying in good faith upon the apparent authority of an officer or agent of a contracting agency, written or oral instructions, or any other request to proceed from a contracting agency, the contracting agency shall pay such person fair compensation therefor.
(b) Whenever any formal or technical defect or omission in any prime contract, or in any grant of authority to an officer or agent of a contracting agency, who ordered any materials, services, and facilities might invalidate the contract or commitment, the contracting agency (1) shall not take advantage of such defect or omission; (2) shall amend, confirm, or ratify such contract or commitment without consideration in order to cure such defect or omission; and (S) shall make a fair settlement of any obligation thereby created or incurred by such agency, whether expressed or implied, in fact or in law, or in the nature of an implied or quasi contract.
(c) Where a contracting agency fails to settle by agreement any claim asserted under this section, the-dispute shall be subject to the provisions of section 13 of this Act.
(d) The Director shall require each contracting agency to formalize all such obligations and commitments within such period as the Director deems appropriate.